# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
August 16, 2016 Session

## IN RE TAMERA W., ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT00379814     Gina C. Higgins, Judge**

_____

**No. W2015-01988-COA-R3-PT – Filed November 9, 2016**

_____

Upon petition of the Tennessee Department of Children's Services ("the Department"), the trial court terminated the parental rights of Mother and Father. Among other things, the trial court concluded that Mother and Father had committed severe child abuse. The trial court also determined that the termination of parental rights was in the children's best interest. Having reviewed the record transmitted to us on appeal, we reverse the trial court's finding that Mother abandoned the children  pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv). Moreover, we reverse the trial court's finding that Mother failed to substantially comply with the requirements of the family permanency plans created in this case. However, we conclude that clear and convincing evidence supports the other grounds for termination relied upon by the trial court, as well as the trial court's finding that the termination of Mother and Father's parental rights is in the children's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Affirmed in Part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and BRANDON O. GIBSON, JJ., joined.

Dennis J. Sossaman, Memphis, Tennessee, for the appellant, L. D. K., Jr.

Theresa D. Childress, Memphis, Tennessee, for the appellant, L. K.

Herbert H. Slatery, III, Attorney General and Reporter; M. Cameron Himes, Assistant Attorneys General, Nashville, Tennessee, for the appellant, State of Tennessee, Department of Children's Services.

Elizabeth W. Fyke, Memphis, Tennessee, Guardian *ad litem.*[1]


**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

In this appeal, we address the termination of parental rights of L.K. ("Mother") to her seven children—T.L.W. (d.o.b. 7/1999), A.E.W. (d.o.b. 1/2001), L.S.W. (d.o.b. 2/2002), Q.D.W. (d.o.b. 9/2003), J.S.W. (d.o.b. 2/2005), A.M.W. (d.o.b. 7/2006), and L.T.K. (d.o.b. 12/2011).[2] We also address the termination of parental rights of L.D.K. ("Father") to three of these children—A.M.W., Q.D.W., and L.T.K. Father is not a biological parent of T.L.W., A.E.W., L.S.W., or J.S.W.

In October 2012, the Department received a referral alleging that one of the children, A.M.W., had been severely physically abused. When a Department investigator inquired about the allegations by showing up at A.M.W.'s school, A.M.W. reported that Mother had whipped her with an extension cord the previous evening. A.M.W. revealed that she was hurting, and her body had visible injury marks. Whereas some of A.M.W.'s wounds were fresh, others appeared to be old and healing. The wounds were evident on her legs, ankles, back, and buttocks.

Subsequent interviews with some of the other children revealed that they too had been abused in the past. Among other things, they reported that Mother had duct taped their wrists, mouths, and eyes while whipping them. They also stated that Mother had required them to remain in squatting positions in the home hallway while they waited to receive their individual whippings. Like A.M.W., some of these children had visible injury marks. In forensic interviews that were later conducted, some of the children stated that Father had been present in the home when the whippings had taken place. Others claimed that Father had also whipped them directly, albeit with a belt instead of an extension cord.

On October 19, 2012, Mother was arrested and charged with four counts of aggravated child abuse. Although the home of a maternal uncle was identified by the Department as a potential place for the children's placement, this placement did not materialize when the uncle reported that he was not able to provide adequate care. On

---

[1] Guardian *ad litem* did not file a brief.

[2] In cases involving minor children, it is this Court's policy to redact names sufficient to protect the children's identities.

October 26, 2012, the Shelby County Juvenile Court placed the children in the temporary custody of the Department. Approximately eleven months later, on September 13, 2013, the Juvenile Court found that the minor children were dependent and neglected.[3] As part of its findings, the Juvenile Court noted that Mother had severely abused the children. Although the matter came to be reheard by the Juvenile Court on March 10, 2014, the children were once again found to be dependent and neglected.[4] The Juvenile Court also relieved the Department from making reasonable efforts to reunite Mother with her children.

Following the children's removal from Mother and Father's home, a number of family permanency plans were created. The first of these plans, which was created on November 19, 2012, had alternative permanency goals of "Return to Parent" and "Exit Custody with Relative." The record shows that on the same day that this plan was created, both Mother and Father received a copy of the "Criteria & Procedures for Termination of Parental Rights." Although the second permanency plan had alternative permanency goals of "Adoption" and "Return to Parent" when it was created on September 19, 2013, the Juvenile Court did not find these goals to be appropriate when it reviewed the plan in October 2013. Citing Mother's abuse of the children, the Juvenile Court changed the permanency goals to "Exit Custody with Relative" and "Adoption." These same goals were included as part of the final permanency plan created on September 17, 2014. Among other things, the permanency plans required Mother and Father to complete a mental health assessment and follow all treatment recommendations and to participate in counseling geared toward recognizing the effect of abuse on the children.

On September 4, 2014, the Department filed a petition seeking to terminate Mother and Father's parental rights in the Shelby County Circuit Court.[5] With respect to Mother, the petition alleged that the following grounds for termination existed: (1)

---

[3] Although this Opinion references the dates that various orders were signed by the Juvenile Court, inexplicably, many of the orders reflect that they were not stamped filed by the Clerk until several months later.

[4] Although an appeal of the dependency-neglect finding was subsequently taken to the Shelby County Circuit Court, the record indicates that the dependency-neglect litigation was still pending in Circuit Court at the time the appeal of this termination proceeding was taken.

[5] The petition also sought to terminate the parental rights of C.C., the alleged father of A.E.W. Although C.C.'s parental rights were eventually terminated by the trial court, his rights are not at issue in this appeal. Moreover, we observe that the petition identified J.W. as one of the children's fathers and named him as a Respondent. However, the petition noted that J.W. was deceased and attached his death certificate in support of this fact.

Mother had abandoned the children by failing to support them; (2) Mother had abandoned the children by engaging in conduct prior to incarceration that exhibited a wanton disregard for the children's welfare; (3) Mother had failed to substantially comply with the provisions of the permanency plans; and (4) Mother had committed severe child abuse against the children.[6] With respect to Father, the petition alleged two grounds for termination: (1) that Father had failed to substantially comply with the provisions of the permanency plans and (2) that Father had committed severe child abuse.

A hearing on the termination petition occurred over several dates in July 2015, and on August 7, 2015, the trial court announced by oral ruling that it was terminating both Mother and Father's parental rights. A written order memorializing this ruling was later entered by the trial court on September 18, 2015. Pursuant to its September 18 order, the trial court determined that Mother had abandoned the children by willfully failing to support them, that Mother had abandoned the children as defined under Tennessee Code Annotated section 36-1-102(1)(A)(iv) by engaging in conduct prior to incarceration that exhibited a wanton disregard for the children's welfare, that Mother had failed to substantially comply with the provisions of the permanency plans, and that Mother had committed severe child abuse. As for the grounds supporting the termination of Father's parental rights, the trial court determined that Father had failed to substantially comply with the provisions of the permanency plans and that he had committed severe child abuse. The trial court further concluded that the termination of both Mother and Father's parental rights would serve the children's best interest. In support of its decision to grant the Department's termination petition, the trial court noted that its findings as to both the grounds for termination and the children's best interest were supported by clear and convincing evidence. This timely appeal followed.

## ISSUES

Mother's appellate brief raises two issues for our review. Her first issue challenges the trial court's finding that the termination of her parental rights was in the children's best interests. Her second issue challenges the trial court's determination that she failed to substantially comply with the provisions of the permanency plans. Father's brief raises a single issue: whether he had the intellectual ability to have acted in conformity with the permanency plans or to have known that Mother inflicted abuse on the children.

---

[6] In setting out the grounds for termination, the petition contains a section heading entitled "Abandonment by Failure to Visit or Support." We note, however, that the allegations contained under that heading relate solely to Mother's failure to *support* the children in the four months preceding the filing of the petition.

- 4 -

Our review on appeal is not limited by Mother's failure to address every ground for termination relied upon by the trial court to terminate her parental rights or by Father's failure to address the trial court's determination that termination of his parental rights was in the children's best interest. In order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007) (citations omitted). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citation omitted). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015), *no perm. app. filed*. Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). This

heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143 (citations omitted).

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.* (citations omitted).

## DISCUSSION

Consistent with the Tennessee Supreme Court's direction in *In re Carrington H.*, we are required to review the trial court's findings as to each ground for termination. *See In re Carrington H.*, 483 S.W.3d at 525-26. Accordingly, in the analysis that follows, we review each ground for termination relied upon by the trial court separately. However, notwithstanding the comprehensive nature of our review, we ultimately need only find that one ground for termination was established in order to uphold the trial court's decision. *In re Valentine*, 79 S.W.3d at 546.

## __Abandonment__

The first ground for termination listed in our termination statute, and the most frequently relied on, is abandonment. *In re Audrey S.*, 182 S.W.3d at 862 (citations omitted). The acts that constitute abandonment are outlined in Tennessee Code Annotated section 36-1-102, which provides five alternative definitions. In this case, the trial court determined that Mother abandoned the children pursuant to two of the five statutory definitions in section 36-1-102. We address each of these determinations in turn.

*Abandonment by Willful Failure to Support*

The first ground for termination cited in the trial court's September 18, 2015 order is the definition of abandonment provided for in Tennessee Code Annotated section 36-1-102(1)(A)(i). Pursuant to that definition, a parent's parental rights may be terminated when:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or

adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). For purposes of this definition of abandonment, "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the "willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." *Id.* § 36-1-102(1)(D). Token support is defined as "support, [that] under the circumstances of the individual case, is insignificant given the parent's means." *Id.* § 36-1-102(1)(B).

In concluding that Mother had abandoned the children by willfully failing to support them, the trial court found as follows:

[F]or a period of four (4) consecutive months immediately preceding the filing of the Petition for Termination of Parental Rights, [Mother] willfully failed to make any contribution whatsoever toward the support of the children, despite being able-bodied and capable of being employed. The petition was filed on September 4, 2014, and [Mother] failed to support the children from May 4, 2014, to the date the petition was filed. The testimony of [Mother] was that she was employed during the four months preceding the filing of the Petition, that she gave money to the children at the courthouse and perhaps during visits, and that she had purchased gifts for the children during the four months preceding the filing of the Petition, but had not delivered the gifts to the children. The Court finds that the monies [Mother] gave to the children were all token gifts and not consistent or adequate enough for the Court to find that she supported her children during the four months preceding the filing of the Petition. Additionally, the Court notes that [Mother] was required under the permanency [plan] to provide support for the children, that [Mother] was advised of her duty to provide support, and [Mother] understood her duty to support her children. Likewise, the Court finds that [Mother's] testimony that she . . . had purchased gifts, but not delivered them was not credible. The Court finds that there was no justifiable reason for [Mother] to not support the children and that she thereby willfully abandoned them.

Having reviewed the record, we conclude that the evidence does not preponderate against the trial court's factual findings on this issue. Moreover, we agree with the trial court's

conclusion that this ground for termination was established by clear and convincing evidence.

*Abandonment by Wanton Disregard*

We next review the trial court's determination that Mother abandoned the children by engaging in conduct prior to incarceration that exhibited a wanton disregard for the children's welfare. This definition of abandonment, which is found in Tennessee Code Annotated section 36-1-102(1)(A)(iv), reads as follows:

> **A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child**, or the **parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and** either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or **the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child**[.]

*Id.* § 36-1-102(1)(A)(iv) (emphasis added). As this Court has previously observed, this statute "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Indeed, the "decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* (citation omitted). With that said, an incarcerated parent can only be found guilty of abandonment under the second test of Tennessee Code Annotated section 36-1-102(1)(A)(iv) "if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Under the statute, "the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

On appeal, the Department concedes that this ground for termination is inapplicable. In pertinent part, it notes that the record is devoid of any testimony that reflects that Mother was incarcerated for the time periods required under the statute. We agree and therefore reverse the trial court's decision to terminate Mother's parental rights on the basis of Tennessee Code Annotated section 36-1-102(1)(A)(iv).

**Substantial Noncompliance with the Permanency Plan Requirements**

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014) (citations omitted). "The trial court must then find that the noncompliance is substantial." *Id.* (citation omitted). Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

In pertinent part, the permanency plans created in this case required Mother and Father to accept child education classes, receive anger management counseling, attend counseling geared toward recognizing the effect of abuse on the children, submit to a mental health assessment and follow all recommendations, and pay child support. The trial court concluded that both parents failed to substantially comply with the permanency plan requirements. Having reviewed the record transmitted to us on appeal, we reverse the trial court's conclusions on this ground for termination as they relate to Mother, but affirm the trial court's conclusions as they relate to Father.

There is no dispute that Mother attended parenting classes, received anger management counseling, and submitted to psychological evaluations. Although there was testimony that Mother did not pay any child support while the children were in the Department's custody,[7] there was evidence that she paid some support. At an October 7, 2013 review of the permanency plan created on September 19, 2013, the Juvenile Court found specifically as follows: "[T]he mother is[] in substantial compliance with the permanency plan in that she is attending her supervised visits with the children, she is

_____

[7] When specifically asked if Mother had paid any child support, a supervisor with the Department responded as follows: "Not that I'm aware of."

attending individual counseling, and **she is supporting the children financially**." (emphasis added)  Although the evidence in the record preponderates in favor of a finding that Mother did not ever pay child support consistently, there is thus evidence that she made some efforts to provide for the children financially.  We also note that although there was some evidence in the record creating a question as to whether Mother actually received individual counseling as required, it is not apparent to us that the trial court actually discredited Mother's testimony—or that of her counselor—that counseling occurred.  With respect to this matter, we observe that the trial court noted as follows in its September 18, 2015 order:

> Testimony was presented by Zanthresa Hampton that she was providing individual counseling to [Mother] as required by the permanency plan. However, the Court notes that this information was either hidden or not reported to the Department and the Court further rejects Ms. Hampton's testimony that [Mother] has developed the skills and tools needed, from her counseling sessions, to parent the children.

As best as we are able to discern, the trial court's criticisms are twofold as it relates to Mother's counseling requirement: (1) Mother did not adequately update the Department on her counseling attendance and (2) Mother's counseling did not result in the development of needed parenting skills.  We recognize that the trial court's criticism on the first issue perhaps suggests that the trial court took a dim view of the testimony affirming Mother's counseling attendance, but inasmuch as the trial court made a specific finding on the latter issue, it appeared to make an implicit determination that counseling did, in fact, take place.

We note that these criticisms are the only written findings where the trial court specifically detailed Mother's alleged noncompliance with the permanency plans. Moreover, to the extent that they focus on the *effect* of Mother's counseling, we note that they are misplaced with respect to this ground for termination.  As this Court has previously made clear, "outcome achievement is not the measure of compliance." *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009) (noting that even if the mother did not learn how to effectively parent the children, that was not a dispositive factor in a determination of termination based on substantial noncompliance).  Thus, it is of no consequence to this ground for termination whether Mother's counseling was successful.  Mother's compliance in attending counseling is the relevant consideration.

Considering Mother's efforts as a whole, we cannot conclude, by clear and convincing evidence, that she was in substantial noncompliance with the permanency plan requirements. At trial, a Department supervisor placed particular importance on

- 10 -

Mother's completion of a mental health assessment, and in its brief on appeal, the Department argues that Mother's need to attend counseling was of special significance. We would not disagree that these requirements under the permanency plans should be assigned significant weight given the history of abuse involved in this case. However, as noted above, Mother submitted to psychological evaluations and the trial court's findings of fact implicitly acknowledge that she attended individual counseling. Accordingly, notwithstanding her failure to consistently support the children financially, Mother was in compliance with the most important of the tasks under the permanency plans. Moreover, as we have already detailed, it is undisputed that she attended parenting classes and received anger management counseling. In light of these considerations, we are of the opinion that there is insufficient evidence to conclude that Mother was in "substantial noncompliance."

With that said, we affirm the trial court's determination that Father was in substantial noncompliance with the permanency plan requirements.[8] Father admitted at trial that he had not done what was required of him under the permanency plans. Although the evidence revealed that Father had submitted to a psychological evaluation a few months immediately preceding the commencement of trial, the belated timing of this evaluation impeded Father's ability to follow the evaluator's recommendations, which included being reevaluated and submitting to treatment by a psychiatrist who has the ability to provide medication management and therapy. According to the psychologist who evaluated Father, Father also needed to be involved in parenting training with Mother. Father claimed at trial that he made an appointment to seek medication for his prior diagnoses of schizophrenia and bipolar disorder, but he could not confirm that his appointment was with an actual doctor. When asked about this, he specifically stated as follows: "I'm not sure what she is." With respect to the required parenting training,[9] Father admitted that he had not completed it.

---

[8] Although it does not ultimately affect our conclusion herein given Father's widespread noncompliance, we note that the trial court's final order states, in error, that one of Father's requirements under the plans was to "maintain stable housing." We are unable to locate where this requirement was mandated as one of Father's responsibilities. We recognize that providing the children a "stable" place to live was listed as a "Desired Outcome" on the plans, but a desired outcome is different from a statement of responsibility. "Tenn. Code Ann. § 36-1-113(g)(2) does not require substantial compliance with a permanency plan's '[d]esired outcome[s],' rather, it requires substantial compliance with a plan's **statement of responsibilities**, *i.e.*, the actions required to be taken by the parent or parents." *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *8 (Tenn. Ct. App. Sept. 15, 2006) (emphasis added).

[9] We note that parenting training was not only recommended by Father's evaluating psychologist, but it was also required under the terms of the permanency plans.

In general, Father's testimony indicated that he was disinterested in complying with the permanency plans.  He stated that he had not read the plans and testified that he was "distracted" whenever Mother read them to him.  When asked if he had taken any steps to do any of the things that Mother had done pursuant to the permanency plans, Father responded as follows:  "I really didn't feel like I had to do anything to be truthful because I always feel like it really shouldn't have nothing to do with me."  Father's sentiments on this issue were also relayed by the testimony of Sandra Walker ("Ms. Walker"), a supervisor with the Department.  When she was asked if Father had ever been proactive in attempting to get the children returned to him, Ms. Walker testified as follows:  "No.  He stated that he was relying on the mother . . . to do that."  In light of the foregoing, we are satisfied that clear and convincing evidence supports the trial court's determination on this ground as it pertains to Father.

In reaching our conclusion on this issue, we reject Father's argument that his prior diagnoses of schizophrenia and bipolar disorder prevented him from having the intellectual ability to act according to the requirements of the permanency plans.  As an initial matter, we note that it is unclear whether Father is actually schizophrenic or bipolar.  Notwithstanding Father's testimony that he had previously been diagnosed with these conditions, Father's evaluating psychologist, Dr. Kenneth Jones ("Dr. Jones"), was not sure whether these diagnoses were proper.  As Dr. Jones stated in an evidentiary deposition admitted at trial:  "I would recommend that he get involved immediately with a treating psychiatrist who could assess and determine [whether] this guy needs to be on XYZ meds and involved in this kind of treatment, or that diagnosis is inaccurate and he doesn't have this disorder[.]"

Regardless of whether Father's prior diagnoses have any merit, Dr. Jones' assessment of Father indicates that Father had the intellectual ability to understand his surroundings and process relevant information.  When describing his meeting with Father in general terms, Dr. Jones stated as follows:  "So, he understood the process, he understood what had happened and what had been alleged to have happened and why the children weren't in [his and Mother's] care."  Although some of Father's scores on the WAIS-IV test[10] indicated that he was functioning on the "borderline" range, Dr. Jones attributed some of this to a "lack of education rather than a lack of ability."  As he explained:

> [B]ecause of his verbal comprehension, things that brought his score down
> were things like vocabulary, and then an information subtest where we are
> asking them questions like, you know, on what continent is Brazil, things

---

[10] Dr. Jones described this test as "the adult version of a cognitive functioning assessment tool that is widely used."

he would have learned in school that he never got exposed to. So, that doesn't mean he can't learn it, it just means he didn't. And so that is what brought his overall score down into the borderline range, but he was functioning at a -- he understood the process and **he was functioning at a high enough level to know that he was comprehending what was going on**.

(emphasis added). In light of this testimony, we find no merit in Father's assertion that he lacked the requisite mental capacity to have acted with knowledge with respect to the requirements of the permanency plans.

## Severe Child Abuse

A parent's parental rights may also be terminated when:

The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tenn. Code Ann. § 36-1-113(g)(4). Under Tennessee Code Annotated section 37-1-102, severe child abuse is defined, in part, as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(22) (Supp. 2016).[11]

In this case, the trial court concluded that both Mother and Father committed severe child abuse. Concerning Mother specifically, the trial court noted as follows:

[Mother] has committed severe child abuse against the children . . . in that they have been physically abused by [her]. The Court notes that the children's hands and mouths have been duct taped, they have been stripped

---

[11] We note that a provision was added to section 37-1-102 following the trial court's order of termination. At the time of the hearing of the Department's termination petition, the cited definition of severe abuse was located at Tennessee Code Annotated section 37-1-102(b)(21). *See* Tenn. Code Ann. § 37-1-102(b)(21) (2014).

of their clothing, and they have been required to do excessive squats all of which took a physical, emotional, and mental toll on these children[.]

Concerning Father, the trial court found that he had "failed to timely or significantly intervene to protect the children from the physical abuse they sustained from [Mother]. Moreover, the trial court noted that Father "seemed to withdraw when the children were abused and that he simply deferred to [Mother] with regard to everything that happened[.]"

The evidence does not preponderate against the trial court's findings on this issue. Photographs of injuries sustained by several of the children were introduced into evidence at trial. These photographs show significant cuts/lacerations on several portions of the children's bodies, injuries which are consistent with the stories of abuse chronicled in reports from forensic interviews conducted after the children's removal from Mother and Father's home. The accounts detailed by these reports are troubling and align with the reports initially made to Tanisha Harper, the Department investigator who first inquired into the allegations of abuse in this case. As detailed in the reports from the forensic interviews, multiple children disclosed these following elements of abuse: (1) Mother had whipped the children with an extension cord or belt, often with the children's clothes off; (2) the children's hands, eyes, and mouths were often taped when they received their whippings; and (3) the children were required to remain in a squatting position in the hallway while they waited to receive their whippings. The following account, which is taken from the report of A.M.W.'s forensic interview, is indicative of the other reports in the record:

> [A.M.W.] said her mother whips them one at a time, in . . . bedroom with the door closed. She said her mother . . . tied her mouth & arms up with a blue & gray tape. Victim said she was also made to lay on the cold floor with no clothes on; then is whipped all over her body with an extension cord leaving marks on her ". . . back, pocketbook/vagina, arm and lower legs.["] She said these areas were also bleeding. Child said sometimes her mother ties her arms up with a green and gray belt. Victim also mentioned her lower legs being tied up with tape. [A.M.W.] said her siblings had to squat in the hallway, until it was their time to be disciplined. Note: Child demonstrated the squatting position. [A.M.W.] said she witnessed blood on [L.S.W.] and [Q.D.W.'s] body & blood running down the legs of . . . [J.S.W.] and blood running down her brother's back.

Although Mother denied several aspects of her abuse of the children at trial, such as the use of duct tape and an extension cord, she did not deny that she had whipped the children. Moreover, she admitted that she had, on occasion, required the children to

remove their clothes for whippings. Having reviewed the entirety of the record transmitted to us on appeal, we conclude that there is clear and convincing evidence that Mother severely abused the children.

There is also clear and convincing evidence that Father committed severe child abuse through his failure to protect the children from Mother's actions. *See in re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *6 (Tenn. Ct. App. July 13, 2004) ("Parents who have not themselves severely abused their own child may still be found to have committed severe child abuse if they knowingly exposed the child to, or knowingly failed to protect the child from, conduct constituting severe child abuse.") (citation omitted). Indeed, the evidence does not preponderate against the trial court's factual finding that he failed to intervene to protect the children and simply deferred to Mother. Several of the children's forensic interview reports indicate that Father was around during the whippings and aware of the specific abuse the children sustained. The report from T.L.W.'s forensic interview, for example, notes as follows: "She told the interviewer that the times when [Father] was around during the whoopings [sic] he would tell their mother, 'you don't have to whoop those children like that' and her mother would tell him, 'these are my children.'" According to another forensic interview report, "[Q.D.W.] said that if his father was present he would tell their mother that she didn't need to whoop them like that." Moreover, the report from J.S.W.'s forensic interview notes that "sometimes her dad would see the tape in their hands after the whippings." Even Father's own testimony reveals his awareness of the abuse:

> Q. Would you know she was going to spank the children?
>
> A. Sometimes.
>
> Q. Would you hear her spanking the children?
>
> A. I would be outside, or I would be in the other room.
>
> Q. Would you go outside because she was spanking the children, or are you saying you were already there?
>
> A. I would just go outside and be doing stuff to my car or be doing yard work, or else I would be sitting in the front room. Yeah, about once or twice sitting in the front room I heard them, you know.
>
> Q. Did you ever talk to her about spanking the children?
>
> A. I did.

- 15 -

Q.  What did you talk to her about?

A.   Maybe they didn't need a spanking like that, but as far as squatting and stuff like that, that's fine, but, you know, as far as her disciplining as far as spanking like that, I really just didn't.

Although Father argues on appeal that he lacked the intellectual ability to have known that severe abuse was being inflicted upon the children, we have already rejected this mental capacity argument as it relates to his noncompliance with the permanency plans.  As already noted, Dr. Jones determined in his evaluation of Father that Father was "functioning at a high enough level to know that he was comprehending what was going on."  Moreover, the record is replete with evidence that Father was aware of the nature of the abuse being inflicted on the children.  Father testified that he informed Mother on one occasion that "[m]aybe [the children] didn't need a spanking like that," and there are other instances in his testimony that reflect an awareness that he failed to take appropriate action.  At one point, he specifically stated as follows:

I have been thinking like for the last month up until now that it was like a number of times that I could have stepped in and, you know, said, you know, don't do it or go outside or get you some rest or me and the kids could have took a walk somewhere and basically talk to her and try to talk to the children, go up to the school and do different things.

He again expressed regret for his inaction at another point in his testimony:

And now I'm wishing that I would have actually just stepped in and, you know, said stop or said that's too much or said let me take the kids out somewhere or just go to my mom's house or my aunt's or my cousin's house or something like that.  And I wasn't really involved in, you know, stuff like that.  I just mainly was all about self and worrying about myself and, you know, where I was going to live and, you know, how I was going to eat and how I was going to clothe myself and things like that.

In short, the evidence indicates that Father was aware of the abuse and knew that it was wrong.  We accordingly affirm the trial court's determination that clear and convincing evidence establishes this ground for termination as it relates to him.

## Best Interests

Despite our conclusion that statutory grounds for termination exist, such proof does not by itself justify the termination of a parent's parental rights. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citation omitted), *perm. app. denied* (Tenn. Mar. 5, 2014). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, the General Assembly has codified a list of nine, non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings. These factors are as follows:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *Moody*, 171 S.W.3d at 194).

In support of its determination that terminating Mother and Father's parental rights was in the children's best interests, the trial court made several findings of fact. In relevant part, the trial court found as follows:

24. Pursuant to Tennessee Code Annotated Section 36-1-113(i)(1)-(9), termination of parental rights is in the best interest of the children in that Respondents [Mother and Father] . . . have failed to make such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in their homes; they have failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not appear reasonably possible.

25. The Court finds that these children have been out of the [parents'] home for three years. The youngest child could have no bond with her parents and the older children have expressed a desire to not return to

[Mother and Father's] home. The middle children, however, do desire to return home, but the Court finds that these children were never truly nurtured in the parents' home and were subjected to a pattern of abuse. The Court finds that reasonable efforts were made by the Department, but in contrast the parents made no effort on their part to remedy the situation and be reunited with their children. [Mother and Father] are in need of continued counseling and therapy and the children cannot stay on hold to allow the parents to begin to try to get themselves together.

\* \* \* \*

27. A change of caretakers and physical environment is likely to have a traumatic effect on the children's emotional, psychological and/or medical condition; and all of the children, except [J.S.W.], reside with foster parents who are willing and able to adopt them.

The evidence in the record supports the trial court's findings. The children have been in the custody of the Department since October 2012, and all except one are in foster homes that are willing to adopt them. The children have suffered severe abuse from their parents, and such abuse has not been without significant consequences. L.S.W., who was thirteen at the time of trial, specifically testified that every time she is quiet "all of the bad memories just pop back in my head, what [Mother] did to us." L.S.W. stated that she had been happier since living with her foster family and testified that she would be happiest if she could be adopted. Although there is evidence that some of the children want to return home to Mother and Father, several children testified that they did not want this to occur. Like L.S.W., T.L.W., who was nearly 16 at the time she testified, stated that she wanted to be adopted. She testified that she called her foster parent "Mom" and indicated that in contrast to her life at Mother and Father's home, where she claimed there was violence "[e]very day," there was no violence in her foster home. She testified that she would not want to return to Mother and Father's home even if she could not stay with her current foster placement. She also testified that she would feel sad if the court ordered her and her siblings to return to Mother and Father. A.E.W., who was fourteen years old at the time of trial, also called her foster parent "Mom." She testified that she wanted to be adopted by her foster parent and asserted that she felt "loved and appreciated" at her foster home. When questioned about the prospect of never seeing Mother again if Mother's parental rights were terminated, A.E.W. stated as follows: "I always love her. That is my mom but, yes, I will be okay without seeing her."

Q.D.W. was eleven at the time of trial, and although he indicated that he called his foster parents "Mom and dad," he testified that he missed his parents and wanted to

return home. However, when asked about what his best memory was of living at home with Mother and Father, he stated that his best memory was when he was in school. Although Ms. Walker testified that some of the children wanted to return to Mother and Father, she specifically noted that A.M.W. was sad about her family being separated and was "feeling some guilt." Ms. Walker testified that she believed it was in the children's best interest that Mother and Father's parental rights be terminated. She asserted that the children were "thriving" in foster care and stated that changing caregivers would have a detrimental effect on the children's welfare. Ms. Walker also observed that the parents had not acknowledged the abuse and the effects it had on the children.

With respect to this latter point, we note that Mother denied the extent of her abuse of the children at trial. Specifically, Mother denied that she had ever used an extension cord to beat the children or that she had taped the children's body parts. This denial was in stark contrast to the consistent reports of the children that disclosed the nature of such abuse, and having reviewed the record, it is clear that Mother's testimony on this topic was not accepted by the trial court. Indeed, in characterizing the nature of Mother's abuse, the trial court specifically found that "the children's hands and mouths have been duct taped." Mother's refusal to acknowledge the severity of her past abuse of the children countenances against her desire to regain custody. Moreover, we note that the trial court's findings indicate that Mother has not achieved significant improvement regarding past parenting mistakes. In pertinent part, we observe that the trial court rejected the testimony of Mother's counselor that Mother has developed the skills and tools needed to parent the children. Although Mother takes issue on appeal with the fact that the Department allegedly did not exercise reasonable efforts to reunite her with her children, we note that the Department was relieved of making reasonable efforts with respect to Mother in March 2014 incident to the Juvenile Court's determination that Mother had committed severe abuse. We further note that the trial court found that the Department made reasonable efforts to assist Mother maintain compliance with the permanency plans prior to it being relieved of its efforts.

Although it is true that Dr. Jones did not rule out the possibility that Mother could be an effective parent at some point in the future, he noted that "not enough progress ha[d] been made . . . that would warrant anything different . . . than the day that the children were taken from [Mother's] custody." He simply noted that if reunification was ever to occur, Mother would need to first do both individual and family therapy sessions.

Like Mother, Father is not in a position to parent the children at this point. Dr. Jones stated that Father would need to demonstrate progress over a six-month period before reunification could even be considered. He also noted that Father would need to participate in parenting training with Mother.

The need for permanency in the children's lives and their overall best interest takes precedence over any theoretical potential that exists for the parents' rehabilitation. Mother's and Father's past actions provide little indication that they will be capable of being proper parents to the children anytime soon. Mother is still denying the extent of the abuse that she inflicted on the children, and as we have already outlined, Father previously expressed little to no interest in complying with the family permanency plans that were created in this case. The children need permanency in their lives, and foregoing termination of Mother and Father's parental rights would not serve their best interest. Most of the children have foster parents who are willing to adopt them, and several of the children have expressed a clear preference to not return to Mother and Father. Having carefully reviewed the evidence presented in the record, we conclude that clear and convincing evidence supports the trial court's conclusion that termination of Mother and Father's parental rights is in the children's best interest.

## CONCLUSION

We reverse the trial court's determination that Mother abandoned the children pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv). We also reverse the trial court's determination that Mother was in substantial noncompliance with the requirements of the family permanency plans. In all other respects, however, we affirm the trial court's order terminating both Mother and Father's parental rights. Costs of this appeal are assessed one-half against the Appellant Mother, L.K., and one-half against the Appellant Father, L.D.K. Because both Mother and Father are proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
ARNOLD B. GOLDIN, JUDGE

- 21 -